UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

      v.

DANIEL GREENBERG
                Defendant.

12-CR-301 (ADS)

**DECLARATION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, DANIEL J. GREENBERG, hereby declare under penalty of perjury pursuant to 28 U.S.C §
1746:

1.  I am the defendant in the above-referenced case and submit this declaration in support
of my Motion to Dismiss the Indictment on the basis of the spoliation of evidence by the
government, specifically, the loss of the computers and computer servers of
Classiccloseouts.com and the data on the computers.

2.  I owned and was the principal officer of a business that owned and operated
Classiccloseouts.com ("Classic" or the "Company") from approximately mid-2002 until about
December 22, 2008, when the Classic was sold to Hazen, Inc. and Hazen's owner, Jonathan
Bruk.  As required under the contract of sale, I served as a consultant to Classic through June
2009 and had offices onsite at its headquarters.

3.  Classic's headquarters were located at 110 West Graham Avenue, Hempstead, New
York in a warehouse occupying over 100,000 square feet.  The warehouse housed the
Company's inventory, shipping department, corporate offices, and its computers and computer
servers, which were essential to Classic's operation.

4. Classic had dedicated computers for each of its departments including: (i) computer programmers; (ii) administrative and accounting; (iii) graphic design; (iv) warehouse (shipping and inventory); (v) customer service; and (vi) security.

5. On June 24, 2009, the Federal Trade Commission commenced a civil action against Classic and me in the United States District Court for the Eastern District of New York, captioned, *FTC v. Classic Closeouts, LLC, et al*, 09-CV-2692 (LDW).  A copy of the Complaint is annexed hereto as Exhibit A.

6. On June 29, 2009, the FTC obtained a temporary restraining order placing Classic into receivership, appointing a temporary receiver, and directing the temporary receiver to, among other things: (i) assume full control over Classic; (ii) "[c]ollect, marshal, and take exclusive custody, control and possession of all . . . property, books and records, . . . and other assets and documents of" Classic at its Hempstead headquarters and elsewhere; and (iii) take all steps necessary to secure Classic's Hempstead headquarters.  A copy of relevant portions of the proposed order submitted by the FTC on June 24, 2009, which was endorsed by Judge Wexler, is annexed hereto as Exhibit B.

7. In support of its motion for the TRO, the FTC filed a memorandum of law, dated June 24, 2009, arguing that immediate access to Classic's Hempstead headquarters and expedited discovery was necessary to "preserve records of the Defendants' activities."  According to the FTC, "immediate access will disclose the Defendants' records and protect evidence from concealment or destruction."  Furthermore, "such access can ultimately determine the full scope of the Defendants' law violations, the identities of injured consumers, the amount of consumer injury, and the nature, extent, and location of the Defendants' assets."  In addition, in support of its motion for a TRO, the FTC argued that the appointment of a receiver for CCL is "essential . .

. to prevent the destruction of documents." A copy of relevant portions of the FTC's June 24, 2009 memorandum of law is annexed hereto as Exhibit C.

8. On June 30, 2009, the FTC's lead attorney in the case against me, along with a team of agents and others, including the court-appointed receiver, visited Classic for the stated reason of securing the premises and relevant evidence. The FTC brought an outside contractor to forensically image the computer drives and servers. I was present when the contractor attempted for the entire working day to image the drives and servers, and I saw that he was not performing the task correctly. Because I was familiar with the system, I told him what he was doing wrong, but members of the FTC team told me to leave him alone. In addition, I saw that the laptop he was using in connection with his forensic work was drained of its battery power, and that he had failed to bring a power cord with him to charge the battery or run the computer on AC power. At the end of the day, he had not finished copying the Company's computer drives and servers. The contractor said that he was under enormous time pressure to catch a flight to perform another government contract job and he would have to return at a later date to finish the imaging at Classic.

9. The restrictions in the FTC's TRO effectively barred me from visiting Classic's headquarters. My father had to retrieve my personal items from Classic. During the ensuing months, the premises were under the custody and control of Hazen, Inc.

10. The computers and servers contained the following data both relevant and necessary to my defense:

    a. code written by Classic's computer programmers demonstrating that there was a Frequent Shoppers Club program emailed to Classic's customers in which a customer's credit card would be charged if he or she clicked on a link requesting to become a club member;

    b. records of internal beta testing of the Frequent Shoppers Club program;

c. the database used to generate invitations to customers to participate in the Frequent Shoppers Club program;

d. the database containing records of all "clicks" evidencing that customers clicked on the Frequent Shoppers Club link and *chose* to have their credit cards charged in order to become club members;

e. the mail server showing all promotional Frequent Shoppers Club emails that were sent to customers, thus demonstrating that the customers who claim they did not receive such emails, actually did; in addition, all emails sent to customers confirming membership status resided on the mail server;

f. the database server containing records showing which customers "clicked" and which credit cards were therefore charged after the relevant information was sent to the credit card processor;

g. customer service computers and servers containing customer service records, including internal emails, demonstrating the Company's efforts to refund customers who wished to cancel their memberships and get a refund;

h. the image server and graphic design computers containing graphic design files showing which designs and files were associated with the Frequent Shoppers Club promotional emails;

i. the web server showing which web sites were in use for the Company at all times relevant to the Indictment;

j. warehouse computers containing inventory and shipping records evidencing that promotional free gifts were shipped to new Frequent Shoppers Club members; and

k. customer account pages, both from the point of view of the customers and from Classic's customer service employees, showing all charges, cancellations, and membership status.

11.  Classic had proprietary software called "VIZNETIC" that stored the bulk of customer service data.  Classic also had a server called "Dumbeldore," which contained all records relating to customer transactions, including the email invitations sent to customers to join the Frequent Shoppers Club.

12.  By the end of June 2010, the FTC and I reached a tentative settlement, with no findings of fact or admission of liability or wrongdoing on Greenberg's part. The settlement of the FTC action was finalized and approved by Judge Wexler in December 2010.

13.  After a conference before Your Honor that was held on April 19, 2013, my father and I witnessed a conversation between my previous attorney, Jon Wallenstein, and Postal Inspector Charles Schriver in the hallway outside of the courtroom in which Mr. Wallenstein asked Inspector Schriver where Classic's computers and servers were stored so that our forensic computer expert could review them in advance of trial.  Inspector Schriver answered that the actual computers and servers were in Washington, D.C., under the FTC's custody and control. In addition, Inspector Schriver told Mr. Wallenstein, in sum and substance, that the defense did not need to examine the actual computers and servers because all the relevant data residing on the computers and servers were produced in discovery.  Inspector Schriver added that the data copies of the computers and servers contained the same information that was contained on the actual computers and servers, and would be more easily accessible.  Mr. Wallenstein asked for the data copies, and Inspector Schriver said that he would produce the data copies as soon as possible.

14.  In early May 2013, I was informed by Mr. Wallenstein that the government provided him with the data copies.  Mr. Wallenstein told me that he shipped the data copies to an forensic computer expert he had retained, Larry Daniel, to examine the copies.  Larry Daniel found that the data copies were incomplete and several of them wholly inaccessible.

15.  Because only the actual computers contained all of Classic's data, on May 6, 2013, Mr. Wallenstein asked the Court to authorize funding under the Criminal Justice Act for Larry Daniel to travel to Washington, D.C. to examine and reimage the computers.  A copy of Mr. Wallenstein's May 6, 2013, letter attaching a letter by Larry Daniel is annexed hereto as Exhibit D.

16. On May 7, 2013, I learned from Mr. Wallenstein that he was told by the prosecutors that: (i) the computers and servers are not located in Washington, D.C., (ii) the whereabouts of the computers and servers are unknown; and (iii) the computers and servers are likely lost and gone forever.

17. Although I saved some of the data from Classic to my personal computer, including computer code for the Frequent Shoppers Club and evidence of Frequent Shoppers Club promotional emails sent to customers, I cannot establish chain of custody for these materials in order to introduce them into evidence in my defense at trial.

Dated: New York, New York
June 12, 2013

DANIEL J. GREENBERG

**CV 09 2692**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★  JUN 24 2009  ★

LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

---

**FEDERAL TRADE COMMISSION,**

    Plaintiff,

    v.

**CLASSIC CLOSEOUTS, LLC**, a limited
liability company, also d/b/a
**CLASSICCLOSEOUTS.COM**,

and

**DANIEL J. GREENBERG**, individually, as
an officer of **CLASSIC CLOSEOUTS,
LLC**, and d/b/a **THIRDFREE.COM**,

    Defendants.

---

(S F)

Civ. No.

WEXLER L
BOYLE M

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

---

Plaintiff, the Federal Trade Commission ("FTC") for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

**PLAINTIFF**

4.      Plaintiff FTC is an independent agency of the United States Government created by

statute. 15 U.S.C. §§ 41 - 58. The FTC is charged, *inter alia,* with enforcement of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts

or practices in or affecting commerce. The FTC is authorized to initiate federal district

court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and to

secure such equitable relief as may be appropriate in each case, including restitution and

disgorgement. 15 U.S.C. § 53(b).

**DEFENDANTS**

5.      Defendant Classic Closeouts, LLC ("CCL") is a Nevada limited liability company with

its principal place of business at 110 West Graham Avenue, Hempstead, NY 11550.

CCL also was incorporated as a New York limited liability company. CCL transacts or

has transacted business in this District and throughout the United States. CCL also does

business as Classiccloseouts.com.

6.      Defendant Daniel Greenberg ("Greenberg") is the president, CEO, sole owner, and

managing member of CCL. He also does business as ThirdFree.com ("ThirdFree"), a

business related to CCL, and has represented that he is CEO of ThirdFree. At all times

material to this Complaint, acting alone or in concert with others, he has formulated,

directed, controlled, had the authority to control, or participated in the acts and practices

of CCL and ThirdFree, including the acts and practices set forth in this Complaint.

Defendant Greenberg resides in and, in connection with the matters alleged herein,

transacts or has transacted business in this District and throughout the United States.

## COMMERCE

7.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

8.    Defendants are sellers of consumer merchandise via the Internet since at least 2003, through their Web site, Classiccloseouts.com.

9.    Numerous consumers who purchased items online from Classiccloseouts.com provided their credit card or debit card information to Classiccloseouts.com solely for the purpose of making their intended purchases.

10.   Defendants made the following representations on Classiccloseouts.com:

> "We guarantee that every online transaction you make at
> Classiccloseouts.com will be 100% safe. This means you pay
> nothing if unauthorized charges are made to your card as
> a result of shopping at our online store."

11.   Despite these representations, Defendants repeatedly posted unauthorized charges to the credit and debit card accounts of consumers who had shopped at Classiccloseouts.com.

12.   From approximately June 2008 through at least September 2008, using the consumers' previously provided credit card or debit card information from several months or even years earlier, Defendants charged thousands of consumers' credit cards or debited consumers' bank accounts on one or more occasions in amounts ranging from $29.99 to $79.99 per occasion. Defendants charged the credit cards or debited the bank accounts of some consumers who had made no purchase from Classiccloseouts.com for one or more years.

13.   In numerous instances, consumers did not give any entity related to Defendants authority to charge their credit cards or debit their bank accounts.

14.   In numerous instances, Defendants' unexpected credit card charges or bank account debits have caused consumers to incur costly credit card nonpayment or late fees or bank overdraft fees.

15.   Numerous consumers who called Defendants to complain about and dispute the unauthorized charges or debits were unable to reach a representative, and their telephone messages were not returned.

16.   Numerous consumers who submitted complaints to Defendants via their Web site received no responses to their complaints.

17.   Frequently, consumers who were unable to reach Defendants contacted their credit card company or their bank seeking removal of the unauthorized charges or debits.

18.   Often, upon receiving notice from consumers that Defendants' credit card charges were unauthorized, consumers' credit card companies charged back the unauthorized amounts to Defendants.  Similarly, upon receiving notice from consumers that Defendants' debits to their bank accounts were unauthorized, consumers' banks often credited the consumers' accounts for the unauthorized debit amounts.

19.   In numerous instances, Defendants then sent letters to consumers' credit card companies, objecting to consumers receiving credits for the unauthorized charges.  In these letters, Defendants claimed that these consumers accepted an e-mailed offer from CCL's "sister company," ThirdFree, to join CCL's frequent shopping club, and thus the consumers were not entitled to credits.

20.   In numerous instances, complaining consumers' credit card companies have reapplied the

4

purported CCL frequent shopping club charges, despite the consumers' protestations that these charges to their credit cards were unauthorized.

21.    In all known instances, complaining consumers have denied receiving any e-mail offer for CCL's frequent shopping club, and thus denied accepting any such offer. In many instances, consumers first learned of the CCL frequent shopping club after they complained about Defendants' unauthorized charges to their credit card account or unauthorized debits to their bank account. In many instances, consumers only purchased one item from CCL and that purchase was months or years prior to the unauthorized charges that were placed on their cards.

22.    In numerous instances, Defendants do not issue refunds or credits to consumers and do not reimburse consumers for the credit card late fees or bank overdraft fees caused by Defendants' unauthorized credit card charges or bank account debits.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

23.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

24.    Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n).

## COUNT I

25.    In numerous instances, Defendants have charged consumers' credit cards or debited consumers' bank accounts without authorization, sometimes multiple times.

26.    Defendants' practices of charging consumers' credit cards or debiting consumers' bank accounts without authorization have caused or are likely to cause, substantial injury to

5

consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or competition.

27.  Therefore, Defendants' practices as alleged in Paragraph 25 of this Complaint constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

28.  Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

29.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of the FTC Act. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission of contracts and restitution, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

    A.    Award Plaintiff such temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but

not limited to, temporary and preliminary injunctions, an order freezing assets, appointment of a receiver, and immediate access to Defendants' business premises;

B.  Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.  Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: June 22, 2009

Respectfully submitted

DAVID SHONKA
Acting General Counsel

LEONARD L. GORDON
Director, Northeast Region

ROBIN E. EICHEN
WILLIAM H. EFRON
CAROLE A. PAYNTER
Attorneys
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
Tel. (212) 607-2829
Fax (212) 607-2822

7

EXHIBIT B

# CV 09 2692

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★  JUN 24 2009  ★

LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | Civ. No. |
| v. | |
| **CLASSIC CLOSEOUTS, LLC,** a limited liability company, also d/b/a **CLASSICCLOSEOUTS.COM,** and | |
| **DANIEL J. GREENBERG,** individually, as an officer of **CLASSIC CLOSEOUTS, LLC,** and d/b/a **THIRDFREE.COM,** | |
| Defendants. | |

WEXLER I

BOYLE M

### TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTING A TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF AND AN ORDER TO SHOW CAUSE WHY A <u>PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u>

Plaintiff, the Federal Trade Commission ("FTC") filed its Complaint for a permanent injunction and other relief in this matter, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and the FTC having moved for a Temporary Restraining Order pursuant to Rule 65 of the Federal Rules of Civil Procedure and Order to Show Cause Why a Preliminary Injunction Should Not Issue. The Court has considered the pleadings, declarations, exhibits, and memorandum of law filed in support of Plaintiff's application and makes the following findings of fact:

person or entity who received a copy of the Order. The Temporary Receiver has no obligation under this Section.

## APPOINTMENT OF TEMPORARY RECEIVER

### XIV.

IT IS FURTHER ORDERED that _____, whose address is

_____, is appointed

Temporary Receiver for the Receivership Defendant, with the full power of an equity receiver for the Receivership Defendant, and all of the funds, properties, premises, accounts, and other assets directly owned by the Receivership Defendant. The Temporary Receiver shall be solely the agent of this Court in acting as Temporary Receiver under this Order. The Temporary Receiver shall be accountable directly to this Court. The Temporary Receiver shall comply with all Local Rules of this Court governing receivers.

## RECEIVERSHIP DUTIES AND AUTHORITY

### XV.

IT IS FURTHER ORDERED that the Temporary Receiver is directed and authorized to accomplish the following:

A. Assume full control of the Receivership Defendant by removing, as the Temporary Receiver deems necessary or advisable, any director, officer, independent contractor, employee, or agent of the Receivership Defendant, including any individual, from control of, management of, or participation in, the affairs of the business of the Receivership Defendant and manage and administer the business of the Receivership Defendant until such further Order of this Court by performing all incidental acts that the Temporary Receiver deems to be advisable or necessary, which includes retaining or hiring any employees, independent contractors or agents;

Page 19 of 35

B.  Collect, marshal, and take exclusive custody, control and possession of all funds, property, books and records, accounts, mail, and other assets and documents of, or in the possession, custody, or under the control of, the Receivership Defendant, wherever situated, including but not limited to: 110 West Graham Avenue, Hempstead, NY 11550.  The Temporary Receiver's authority to collect any and all mail relating to the affairs of the Receivership Defendant in the possession, custody, or under the control of, the Defendants, shall extend to mail in the possession of any third parties.  The Temporary Receiver shall have full power to change mailing addresses of the Receivership Defendant.  The Temporary Receiver shall have full power to change any locks on any real or personal property of the Receivership Defendant. The Temporary Receiver shall have full power to divert mail, sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, and other papers and documents of the Receivership Defendant, including documents related to customers or clients whose interests are now held by or under the direction, possession, custody or control of the Defendants or under the control of any third party for the benefit of the Defendants.  The Temporary Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Defendant.

*Provided, however,* the Temporary Receiver shall not attempt to collect any amount from a consumer if the Temporary Receiver believes the consumer was a victim of the unfair acts or practices alleged in the Complaint in this matter, without prior Court approval;

C.  Take all steps necessary to secure the business premises of the Receivership Defendant, including, but not limited to, all such premises located at 110 West Graham Avenue, Hempstead, NY 11550.  Such steps may include, but are not limited to, the following, as the Temporary

CV   09   2692

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★   JUN 2 4 2009   ★

LONG ISLAND OFFICE

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | **Case No.** |
| v. | |
| **CLASSIC CLOSEOUTS, LLC,** a limited liability company, also d/b/a **CLASSICCLOSEOUTS.COM,** | |
| and | |
| **DANIEL J. GREENBERG,** individually, as an officer of said **CLASSIC CLOSEOUTS, LLC,** and d/b/a **THIRDFREE.COM,** | |
| Defendants. | |

WEXLER, I

BOYLE, M!

**MEMORANDUM IN SUPPORT OF PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR A TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

TABLE OF CONTENTS

I.     INTRODUCTION ..................................................... 1

II.    BACKGROUND........................................................ 2
       A.    The Plaintiff FTC Brings This Action in the Public Interest to Obtain
             Redress For Consumers Injured by Defendants' Unlawful Act.......... 2
       B.    Greenberg, Who Owns and Runs CCL, Previously Settled Charges He
             Defrauded Consumers of Almost $800,000 by Not Providing Rebates ...... 4

III.   DEFENDANTS' UNLAWFUL PRACTICES ............................... 5
       A.    Defendants Made Unauthorized Charges on Consumers' Credit Cards
             and Took Money From Consumers' Bank Accounts ..................... 5
       B.    The Defendants Falsely Represented to Credit Card Companies and
             Others that the Consumers had Authorized Charges to the Consumers'
             Credit Cards or Debits to their Bank Accounts......................... 8

IV.    LEGAL ARGUMENT ...................................................11
       A.    Section 13(b) of the FTC Act Gives This Court the Authority to Grant the
             Requested Relief ................................................ 11
       B.    The FTC's Evidence Meets the Standard for Entry of a TRO, Including
             an Asset Freeze, and Preliminary Injunction ......................... 13
             1.    The FTC Needs to Demonstrate Only Likely Ultimate Success on the
                   Merits and a Tipping of the Balance of the Equities. .............. 13
                   a.    The FTC Has Demonstrated a Likelihood of Success on the
                         Merits...................................................14
                         (1)    The Defendants' Unfair Practice of Charging or
                                Debiting Consumers' Accounts Without the Consumers'
                                Authorization Violates Section 5.................... 14
                         (2)    The FTC Has Demonstrated that Greenberg
                                is Liable........................................ 17
                   b.    The Balance of Equities Mandates Preliminary Injunctive
                         Relief....................................................21
       C.    A TRO Should Include an Asset Freeze, Immediate Access, the Appointment
             of a Temporary Receiver, and Other Ancillary Relief .................. 23
             1.    An Asset Freeze is Necessary.................................. 23
             2.    Immediate Access and Expedited Discovery are Necessary........ 24
             3.    The Appointment of a Temporary Receiver is Necessary ......... 25

V.     CONCLUSION........................................................ 26

i

3. **The Appointment of a Temporary Receiver is Necessary.**

Appointing a receiver for CCL is also essential to maintain the *status quo* and to prevent the destruction of documents and the concealment or dissipation of corporate assets where Defendants have engaged in fraud:

> [I]n such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those . . . for whose benefit . . . injunctive action was brought.

*SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981). Decisions in this district comport with this view. *See FTC v. P.M.C.S., Inc.*, 21 F. Supp. 2d 187 (E.D.N.Y. 1998); *SEC v. Am. Bd. of Trade*, 645 F. Supp. 1047 (S.D.N.Y. 1986). A temporary receiver can preserve records and make an accounting that will assist in (1) identifying Defendants' assets, (2) determining the size and the extent of the unlawful practices, and (3) identifying the persons injured.

LAW OFFICES
# JOHN S. WALLENSTEIN
### 1100 FRANKLIN AVENUE
### GARDEN CITY, NEW YORK 11530

**(516) 742-5600 Fax (516) 742-5040**
E-MAIL: JSWallensteinEsq@aol.com

JOHN S. WALLENSTEIN
—
SCOTT MURPHY
Of Counsel

NEW YORK & FEDERAL BARS

CRIMINAL DEFENSE
CIVIL LITIGATION
COMMERCIAL MATTERS

May 6, 2013

**SUBMITTED EX PARTE AND UNDER SEAL**
**FILED BY FAX ONLY**
Honorable Arthur D. Spatt
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

      Re: United States v. Daniel Greenberg
         Docket #12 CR 337 (ADS)

Dear Judge Spatt:

    This letter is filed ex parte and under seal because it relates strictly to the defense function. As Your Honor is aware, the court has previously authorized me to obtain the services of an expert witness in relation to the forensic examination of the computers and computer data which were seized from the defendant's business by the Federal Trade Commission prior to the commencement of the criminal proceedings herein. The FTC seized 31 computers from the defendant's business, and just recently the government provided the digital images of the drives contained within the computers themselves, because the physical computers are being held by the Federal Trade Commission in Washington, D.C.

    The defense expert has begun his analysis of the imaged drives, and has determined that the servers were not transferred to the electronic media provided to us by the government. These computers contain information that is critical to the defense, including, without limitation, exculpatory matter in the form of emails (both incoming and outgoing) and financial data. Without this critical data, the expert is unable to analyze the media properly, and is unable to extract the specific data which we believe will enable us to

successfully challenge the government's evidence, and will prevent us from offering exculpatory evidence at trial.

Annexed hereto is a letter from the expert which explains the issues. He notes that he will require additional funds, but more importantly he will require significant time, since the data which we believed was provided to us is not contained within the media we have.

Accordingly, we respectfully request the following:

1) That the court direct the government to immediately provide access to the physical computers, located in Washington at the Federal Trade Commission, by arranging for the expert to have access to them in *situ*, and permitting him to reimage the drives and take the images to his lab in Raleigh, North Carolina for analysis;
2) That the expert be permitted to expend additional hours, as noted, beyond the initial $5000 which the court has already authorized, in the approximate amount of an additional $10,000; and
3) That the scheduled trial date be adjourned in order to provide sufficient time to allow the expert to obtain the data from the government, and analyze it, so that the defendant may present his defense at trial.

Thank you for your consideration.

Respectfully yours,

JOHN S. WALLENSTEIN

JSW/jh
Enclosure



GUARDIAN
DIGITAL FORENSICS

May 6, 2013

John S. Wallenstein, Esq.

Via Email Attachment

Dear John,

I have had some opportunity to review the data provided by the government.  So far, I have not been able to access all of the data provided, primarily due to the method used to collect the forensic copies performed by the government contractor, CACI who did the onsite forensic copying of the computers.

So far, the issues are that some of the forensic copies are from servers that have multiple hard drives configured in a RAID arrangement.  A RAID arrangement of hard drives is where you take two or three separate hard drives, install them in a server computer and the server hardware makes them look like one single hard drive.

The issue is that some server computers are configured in such a way that the forensic copies of the multiple hard drives cannot be reconstructed back into the "single" hard drive to get to the data that was viewable when the server computer was in operation.

I am continuing to work on this, but I am not confident that I will be able to reconstruct this data from the forensic copies provided.

The documentation provided by the contractor is limited and does not include all the information for the computers, especially for the server computer RAID configurations.  In plain English, they did not gather the proper information for me to rebuild the data.

There are methods that can be used when making forensic copies of server computer RAIDs that would allow the data to be accessed very simply.  However, based on the notes provided by the contractor, they were having multiple issues while on site and ran out of time to use their own words.

When forensically imaging any computer or device, it is always Best Practices to test the forensic images to ensure that the data is in a recoverable and useable format before leaving the location where the work is being performed.  This holds especially true for data contained in more complex scenarios, such as data on a server computer in a RAID configuration.

To ensure that the data was recoverable and in a useable form, the forensic images, or copies, of the RAID configured server computers should have been rebuilt onsite to ensure they were in working order.

Further, it is common practice to make what is known as a "Logical Image" of data contained on complex systems such as server computers in RAID configurations as a "backup" so to speak along with

the physical acquisitions. Basically, this captures all of the "still existing" data on the server computer and ignores the complexities of the RAID configuration, ensuring that all of the data is useable, accessible, and in proper working order. It is important to note that making a logical image takes significantly less time that a full physical acquisition.

Also, at least one of the hard drives was contaminated by the vendor using an old hard drive when performing the forensic copying that contained old case information from another case.

Additionally, the crux of this case appears to be reliant on data that was contained in databases. Specifically SQL Server databases that contained all of the customer histories and transactions, as well as email traffic, order confirmations and so on.

The other critical part of this case is the web sites that were actually in use at the time. These would have resided on a specific kind of server called a web server. I have not found any of the web server data at this point, nor have I found any of the SQL Server databases that I need to determine the customer history and interaction with Classic Closeouts.

It is likely that all of the aforementioned data that is at the heart of this case, the SQL Server databases and the web server data is contained on one of the computer servers in RAID configuration that I have been unable to rebuild at this point in time.

If I cannot locate the data that I need in this case from what has been provided, then our only option is going to be to go to the location where the computers are currently stored, put the server computers back into operation and make new forensic copies of the data.

Finally, the massive amount of data involved in this case, along with the technical issues that will be required to get the databases into a form where the pertinent data can be extracted is going to take a significant amount of time to reconstruct and analyze.

For that reason, I need just for the analysis a minimum of an additional 40 to 50 hours of time.

If I have to go to the location where the computers are stored and get the data from then directly, that is going to take a minimum of two days at the location plus travel to and from the location. This would not only add additional expense, but with having to located the stored computers and coordinate access to them will probably take several weeks.

I look forward to your guidance in these issues.

Sincerely,

Larry E. Daniel, EnCE, DFCP, BCE, ACE, CTNS
Digital Forensics Examiner