UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                        **MEMORANDUM OF**
                                               **DECISION AND ORDER**
            -against-                       12-CR-301 (ADS)(ARL)

DANIEL GREENBERG,

        Defendant.
----------------------------------------------------------X

**APPEARANCES:**

**United Sates Attorney's Office, Eastern District of New York**
*Attorneys for the United States of America*
271 Cadman Plaza East
Brooklyn, NY 11201
       Charles N. Rose
       Walter M. Norkin
       Assistant United States Attorneys

**Creizman PLLC**
*Attorneys for the Defendant*
565 Fifth Avenue, Floor 7
New York, NY 10017
   By:   Eric M. Creizman, Esq., Of Counsel

**SPATT, District Judge**.

      On January 24, 2014, the Defendant Daniel Greenberg (the "Defendant") was convicted on eight counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of access device fraud, in violation of 18 U.S.C. § 1029; one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A; and three counts of money laundering, in violation of 18 U.S.C. § 1957. Presently before the Court is a renewed motion by the Defendant for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 29, or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33.

1

For the reasons that follow, the Court denies the Defendant's motion.

## I. BACKGROUND

From 2002 until 2009, the Defendant owned and operated Classic Closeouts, LLC ("CCL"). He served as CCL's president, managing member and owner, and he was the sole signatory on CCL's bank accounts at Signature Bank. From 2006 until 2009, the Defendant operated CCL from 110 West Graham Avenue, Hempstead, New York. CCL maintained a website, classiccloseouts.com, from which it sold discounted clothing and related merchandise, generally for less than twenty dollars per item. In addition, CCL's goods were included on shop.com, which is an online marketplace that hosts multiple merchants' goods in a singular, searchable database.

In 2002, classicclouseouts.com was certified by TRUSTe, an independent organization that certifies the privacy practices of its Internet licensees. In this regard, a company that is eligible to participate in TRUSTe programs is given the right to post the TRUSTe logo on its websites, as an indication of the trustworthiness of its privacy practices. TRUSTe has a consumer privacy-related dispute resolution service, which allows consumers to report complaints about its licensees so that TRUSTe can then investigate and identify any measures that the licensee would be required to take to remain in the program.

In addition, CCL, as a merchant, established a merchant account with Bank of America Merchant Services ("BAMS") for the purpose of processing VISA and MasterCard charges as payment for items purchased on its website. In May of 2006, CCL entered into an agreement with Cynergy Data, LLC ("Cynergy") to have Cynergy act as its payment processor (the "processing agreement"). A payment processor acts an intermediary between the acquiring bank, such as, in this case BAMS, and the merchant, here CCL.

The processing agreement between Cynergy and CCL established a fee schedule that included a rolling reserve, or an amount of money set in reserve by the payment processor to offset chargebacks incurred by the merchant. A "chargeback" occurs when a cardholder contacts his issuing bank to dispute a charge appearing on his account statement and the issuer charged back that amount to the acquiring bank. When a merchant is able to prove the legitimacy of the initial transaction, a "reversal" occurs whereby the chargeback is reversed, so that the charge reappears on the cardholder's account.

Beginning in June 2008, the Defendant allegedly engaged in an unlawful and fraudulent scheme to charge CCL customers' credit cards or debit their bank accounts, without their authorization and without them purchasing any merchandise. In this regard, over the course of several weeks and months, the Defendant purportedly charged the accounts of customers multiple times, all without authorization. Many of these victimized customers had made small purchases of merchandise from CCL several years prior to the commencement of the Defendant's alleged scheme. However, they had not been aware that CCL had retained their credit card information once they had completed their previous transactions and, in fact, many of the subject credit card accounts that the Defendant charged had been already closed, expired, or were rarely in use at the time of the apparent scheme.

Although aggrieved customers attempted to contact the Defendant and CCL to complain about the charges, the Defendant and CCL ignored their calls, and voicemail and email messages. Moreover, when the customers disputed the charges with their banks, the Defendant allegedly defended the validity of the charges by falsely claiming that the customers enrolled in CCL's alleged "frequent shopper club," which had a one-time charge. In this way, the Defendant was able to obtain reversals on previously issued chargebacks and the banks

3

sometimes required the aggrieved customers to pay these fraudulent charges, despite their protests.

As a result, between June 2008 and August 2008, the Defendant placed approximately 77,000 unauthorized CCL charges totaling about $5 million on his customers' credit and debit cards. However, between July 2008 and April 2009, the victimized customers were able to obtain 48,000 chargebacks for a total of approximately $3.4 million. Nevertheless, the Defendant then caused approximately 19,000 of those chargebacks to be reversed, thereby causing about $1.3 million of the unauthorized charges to reappear on the customers' credit card statements. From July 2008 to August 2008, the Defendant also transferred more than $1 million from his CCL merchant account to various other bank accounts, which he controlled.

On April 26, 2012, the Defendant was indicted and charged with wire fraud, access device fraud, and money laundering through unlawful monetary transactions in connection with the fraudulent scheme outlined above. Subsequently, on November 5, 2012, the Government filed a Superseding Indictment against the Defendant. The Superseding Indictment brought thirteen criminal counts against the Plaintiff. Counts One through Eight alleged wire fraud; Count Nine alleged access device fraud; Count Ten alleged aggravated identity theft; and Count Eleven through Thirteen alleged Money Laundering – Unlawful Monetary Transaction. In sum and substance, the Superseding Indictment alleged that, between June 2008 and August 2008, the Defendant fraudulently charged the credit card and debit accounts of customers of CCL's website, classiccloseouts.com, and also misrepresented the nature of the charges to the customers' banks when customers disputed the unauthorized charges with those banks.

In January of 2014, a trial was held, which spanned more than three weeks. During the trial, the Government presented evidence supporting the allegations contained in the Indictment,

4

as outlined above. While the Defendant had claimed that the fraudulent charges were related to a one-time fee that the customers agreed to as part of joining CCL's "Frequent Shoppers Club" program, the Government offered proof demonstrating that this program did not exist and that the Defendant's former customers never authorized the Defendant or CCL to charge their credit or debit cards.

On January 15, 2014, the Government rested its case and the Defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29. According to the Defendant, the Government failed to establish that (1) the unauthorized charges were fraudulent; and (2) the Defendant was responsible for the charges. In opposition, the Government contended that it had proffered evidence sufficient to prove each element of the counts with which the Defendant was charged. Ultimately, the Court denied the Defendant's initial Fed. R. Crim. P. 29 motion in its entirety, noting that substantial evidence existed to support the Government's case against the Defendant.

Following the Court's denial of his motion, the Defendant presented a limited case in which he introduced a set of bank records that had been admitted pursuant to a stipulation. The Defendant did not call any witnesses or testify on his own behalf before resting. Thereafter, as stated above, on January 24, 2014, the jury convicted the Defendant on eight counts in the Superseding Indictment, which involved wire fraud, access device fraud, aggravated identity theft, and money laundering. Sentencing is currently scheduled for October 31, 2014.

About six weeks later, the Defendant filed the instant motion, renewing his application for a judgment of acquittal pursuant to Fed. R. Crim. P. 26, or in the alternative, seeking a new trial pursuant to Fed. R. Crim. P. 33.

In support of this motion, the Defendant argues that the Government failed to (1) offer direct evidence demonstrating the Defendant's participation in the fraudulent scheme; (2)

5

establish a plausible motive for the Defendant's commission of the fraudulent scheme; (3) establish an opportunity and means for the Defendant to commit the fraudulent scheme; and (4) negate evidence that the Defendant argues demonstrated that CynergyData, which was CCL's credit card processor, and BPS/Tribul, which acted as the intermediary between CCL and Bank of America, were possibly responsible for the fraud.

## II. DISCUSSION

A. Legal Standards

1. The Legal Standard Under Fed. R. Crim. P. 29

The standard on a motion for a judgment of acquittal is well-settled. In the Second Circuit, it has been repeatedly stated that a defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden. See United States v. Thomas, 377 F.3d 232, 237 (2d Cir. 2004); United States v. Tocco, 135 F.3d 116, 123 (2d Cir. 1998); United States v. Russo, 74 F.3d 1383, 1395 (2d Cir. 1996). This is because the evidence must be viewed in the light most favorable to the Government and all permissible inferences must be drawn in its favor. See United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006); United States v. Jones, 393 F.3d 107, 111 (2d Cir.2004); United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996); see also United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir. 1989). The Court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. Tocco, 135 F.3d at 123; see also United States v. Pelaes, 790 F.2d 254, 259 (2d Cir. 1986).

A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997). Further, the elements of the crimes charged may be established entirely by

6

circumstantial evidence.  See United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994).  Also, the Court must consider the evidence in its totality, and not in isolation.  See United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993).

"If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter."  United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  With these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319.

    2. The Legal Standard Under Fed. R. Crim. P. 33

Fed. R. Crim. P. 33 is very brief and states that, upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  This rule by its terms gives a trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  United States v. Thomas, 981 F. Supp. 2d 229, 244 (S.D.N.Y. 2013) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)) (ellipse in original); see also United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005).  In deciding such a motion, the Court may weigh the evidence and the credibility of witnesses, but cannot "wholly usurp" the role of the jury.  United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000); United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).

Similar to the Fed. R. Crim. P. 29 standard, the Fed. R. Crim. P. 33 standard has also been described as a "heavy burden," United States v. Fearon–Hales, No. S1 04CR.231 (LTS), 2005 WL 2385845, at *1 (S.D.N.Y. Sept. 26, 2005), and ""[i]t is well settled that motions for new trials are not favored and should be granted only with great caution."  United States v. Fearon-Hales, S1 04CR.231 (LTS), 2005 WL 2385845, at *1 (S.D.N.Y. Sept. 27, 2005) (quoting

7

United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958)) (internal brackets in original). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).

C. As to the Defendant's Renewed Motion for Judgment of Acquittal or, in the Alternative, a New Trial

As recited above, in support of his present motion, the Defendant contends that he is entitled to a judgment of acquittal pursuant to Fed. R. Crim. P. 29 based on the following grounds: (1) the Government failed to present direct evidence of his participation in the fraudulent scheme; (2) the Government failed to establish a plausible motive; (3) the Government failed to establish opportunity and means; and (4) the Government failed to negate the substantial evidence that other parties had the same motive and opportunity to have committed the fraud of which the Defendant was accused. Alternatively, the Defendant argues that the Court should vacate his conviction and order a new trial pursuant to Fed. R. Crim. P. 33 based on the same grounds. However, the Court finds that the Defendant's arguments are without merit.

As to the Defendant's first ground that the Government did not proffer direct evidence demonstrating the Defendant's role in the fraudulent scheme, in the Court's view, the Defendant's contention is misplaced. This is because "the Court must consider the Government's case 'in its totality rather than in its parts, and may be satisfied by circumstantial evidence alone.'" United States v. Nicolescu, 3:11-CR-24 MRK, 2012 WL 3600185, at *1 (D. Conn. July 25, 2012) aff'd, 541 F. App'x 93 (2d Cir. 2013), cert. denied, 134 S. Ct. 2321, 189 L. Ed. 2d 197 (2014) (quoting United States v. Hawkins, 547 F.3d 66, 70–71 (2d Cir. 2008)); see also United States v. Coplan, 703 F.3d 46, 69 (2d Cir. 2012) cert. denied, 134 S. Ct. 71, 187 L. Ed. 2d 29 (2013) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir.2004) ("[T]he

absence of direct evidence is not dispositive, since 'the government is entitled to prove its case solely through circumstantial evidence.'"). Indeed, "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." United States v. Akefe, 09 CR 196 (RPP), 2010 WL 2899805, at *16 (S.D.N.Y. July 21, 2010) (quoting United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008)).

In this case, considering the totality of the Government's case, the Court finds that the evidence offered by the Government was sufficient to support the jury's conviction of the Defendant. The Government offered testimony establishing that the Defendant created and used a fake "frequent shopper club" template to conceal the placement of unauthorized charges on his victims' credit cards. The Government's case also included testimony, as well as documentary evidence, illustrating the numerous lies the Defendant promulgated to the employees of TrustE, shop.com and CynergyData, as well as to his own employees.

For example, Simona Nass of TrustE testified that TrustE had received an increased number of consumer complaints concerning unauthorized charges by CCL. When she inquired with the Defendant about these complaints, he advised her that the unauthorized charges were the result of a technical glitch over the 2008 Fourth of July weekend. Nass testified that the Defendant's explanation was inconsistent with the fact that TrustE had received twenty-two complaints before July 1, 2008. She also pointed out that the Defendant's explanation was lacking in that he could not describe the cause of the glitch nor did he know the precise number of CCL customers who were impacted.

Similarly, Bruce Sellers, a principal of shop.com, testified that he contacted the Defendant by letter about an increased amount of customer complaints concerning CCL charging their credit cards without authorization. In response, the Defendant explained that CCL had a

9

membership promotion which provided a shipping benefit to customers. The Defendant told Sellers that the complaining customers had been advised of this benefit and many re-opted into membership, while the remaining customers received an immediate credit to their accounts. According to Sellers, the Defendant's explanation was unsatisfactory, because shop.com continued to receive inquiries from customers concerning unauthorized charges by CCL.

In addition to the testimony describing the Defendant's multitude of lies, bank records offered by the Government showed that the fraudulently obtained funds went into and were laundered through bank accounts controlled by the Defendant. Relying on this evidence in conjunction with the above testimony, a reasonable jury could have concluded that the Defendant was guilty of the charges in the Superseding Indictment.

To the extent the Defendant tries to undercut the testimony of Simona Nass and Bruce Sellers, the Court is not persuaded. In this regard, the Defendant claims that the testimony of Nass and Sellers concerning the Defendant's lies were insufficient to overcome the supposedly fatal deficiencies in the Government's proof. However, although the Defendant suggests there are fatal deficiencies in the Government's proof, he offers no details as to what these fatal deficiencies might be.

The Defendant's attempt to diminish the significance of the false letters he sent to credit card companies is similarly unavailing. These letters misled credit card companies into believing that their customers complaining about unauthorized charges by CCL had actually opted to join a "Frequent Shoppers Club" program, thereby resulting in the charges to their credit cards. However, the evidence and testimony at trial revealed that no such program existed, and a rational jury could have concluded that the Defendant perpetuated these lies in order to conceal his fraudulent scheme.

The Defendant also tries to shift the blame to BPS/Tribul by suggesting that it had "the greatest motive to lie to the credit card companies and reverse chargebacks," because "if [CCL] fail[ed] to pay for any chargebacks or fees related to their merchant processing, [ ] BPS/Tribul would be held liable to pay for it." (Def. Mem., pg. 6, internal brackets omitted.) However, the Defendant's argument fails to take into account the fact that the bank records presented by the Government at trial revealed that the money from the unauthorized charges ultimately ended in accounts owned by the Defendant, not BPS/Tribul.

Lastly, while the Defendant emphasizes that there was evidence that he attempted to credit any CCL customer who complained of unauthorized charges on his or her credit card, he overlooks the fact that he made no attempt to credit the cards of those victims who did not lodge a complaint. Accordingly, a reasonable juror could have inferred that the Defendant simply addressed the customer complaints in order to quash suspicions and to prevent the larger fraudulent scheme from being revealed.

Thus, notwithstanding the Defendant's argument that there was no direct evidence proffered at trial, the Government presented significant evidence that the Defendant orchestrated a fraudulent scheme, which he attempted to conceal by offering a series of lies about the nature of the unauthorized charges. In the Court's view, given the totality of the Government's case, a rational jury could have convicted the Defendant on the charges contained in the Superseding Indictment. See United States v. Vasilevsky, 08 CR 903 (SAS), 2009 WL 2462522, at *3 (S.D.N.Y. Aug. 7, 2009) ("In support of their [Rule 29 motion], [the Defendants] point to the lack of direct evidence of defendants' knowledge that the checks were stolen or of their intent to defraud a financial institution. However, it is well-established that knowledge and intent may be proven by circumstantial evidence alone.") (emphasis in original) (citations omitted), aff'd in

11

part sub nom. United States v. Spitsyn, 403 F. App'x 572 (2d Cir. 2010), cert denied. 131 S. Ct. 1549, 179 L. Ed. 2d 358 (2011).

As to the Defendant's second argument that the Government failed to establish a plausible motive, the Court finds it to be irrelevant to the Defendant's motion. Motive is not an element of any of the counts of which the Defendant was convicted. See, e.g., United States v. Awan, 384 F. App'x 9, 13 (2d Cir. 2010) (quoting United States v. MacPherson, 424 F.3d 183, 185 n.2 (2d Cir. 2005)) (rejecting the defendant's argument that the Government "fail[ed] to provide evidence that [he] engaged in the charged crimes[,]" including money laundering, because "when '[m]otive is not an element of the crime . . . the lack of evidence [thereof] does not, as a matter of law, preclude conviction") (internal brackets and ellipse in original); United States v. Weinsten, 172 F.3d 39 (2d Cir. 1999) ("[P]roof of motive is not an element of the offense of mail fraud."); United States v. Miller, 641 F. Supp. 2d 161, 166 (E.D.N.Y. 2009) (citing MacPherson, 424 F.3d at 183 n.2) ("The government need not prove motive to prevail at trial on the charges in the indictment [of aggravate identity theft pursuant to 18 U.S.C. § 1028A]."). As a consequence, the Government was not required to introduce evidence establishing a plausible motive on the part of the Defendant.

The Defendant's third contention is that the Government failed to establish opportunity and means to coordinate the fraudulent scheme. However, the evidence presented by the Government at trial, including the testimony of Simcha Geller, who was the head of CCL's customer service, and the testimony of Venkata Chittabathini, a full-time computer programmer, demonstrated how the Defendant was able to orchestrate the fraud. In this regard, Geller testified that the Defendant was the only individual who was both able and authorized to charge a customer's credit card and the he could do this remotely. In addition, he stated that the credit

cards of CCL customers could be charged in batches, in that there was a program that could charge multiple credit cards simultaneously, instead of requiring the manual entry of each credit card. Of note, despite the Defendant's assertion to the contrary, the Court finds that Geller's testimony was neither speculative nor improper expert testimony, since his testimony was based on his personal knowledge and experience with CCL's website and computer systems.

Further, Chittibathini testified that the Defendant instructed him to create the "Frequent Shopper Club" membership program template even though the "Frequent Shopper Club" did not actually exist. According to Chittibathini, although the program template he created would not have permitted the Defendant to charge CCL customers simultaneously, the Defendant could have worked with other programmers, including Zev Eisenberg, to develop and execute a program that would have allowed the Defendant to charge CCL customers at the same time and remotely. In addition, the Defendant was able to access the "back end" of the CCL computers using a virtual private network. Therefore, the jury could have reasonably inferred that even though the Defendant was overseas when the fraudulent scheme occurred, he nevertheless had the opportunity and means to carry out the fraudulent scheme underlying the counts of which he was convicted.

Lastly, the Defendant's final argument challenges his conviction on the ground that there was substantial evidence that others had the same motive and opportunity to commit the fraudulent scheme, and that the Government failed to negate this evidence. As to this contention, the Court is unconvinced. Indeed, while the Defendant speculates that either Cynergy or BPS/Tribul could have caused the fraud, he overlooks the fact that the evidence presented by the Government at the trial overwhelmingly implicated him as the orchestrator of the fraudulent scheme. As discussed above, when confronted about the unauthorized charges to CCL

13

customers, the Defendant lied, including to Cynergy and BPS/Tribul, in order to conceal his fraudulent conduct. These lies involved claiming that the charges were related to a "Frequent Shopper Club" membership promotion when no such club existed or by blaming a computer glitch. Moreover, tellingly, the bank records offered by the Government at trial revealed that the money acquired through the unauthorized charges ultimately ended in the bank accounts of the Defendant. In any event, "[w]hen there are 'competing inferences, a court must defer to the jury's choice, because it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.'" United States v. Santiago, 13 CR 39 CM, 2014 WL 4827883, at *2 (S.D.N.Y. Sept. 26, 2014) (quoting United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014)).

In sum, none of the Defendant's arguments are sufficient to warrant relief pursuant to Fed. R. Crim. P. 29 or 33. As such, the Defendant's motion is denied in its entirety.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendant's motion for acquittal is denied in its entirety.

**SO ORDERED.**

Dated: Central Islip, New York
October 8, 2014

                                        ___*Arthur D. Spatt*_____
                                          ARTHUR D. SPATT
                                        United States District Judge